**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No. 25-cr-00144-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

CARL HOWARD PAYNE

      Defendant.

> **Court Exhibit**
>
> **1**

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Jasand Mock and Dustin André-Vandenberg, Assistant United States Attorneys for the District of Colorado, and the defendant, Carl Howard Payne, personally and by counsel, Luke McConnell, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.  This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

## I.    AGREEMENT

### A.  Defendant's Agreement

The defendant agrees to:

(1)     waive indictment and plead guilty to an Information charging a violation of 18 U.S.C. § 875(c) – interstate communication of a threat; and

(2)     waive certain appellate and collateral attack rights, as explained in detail below.

### B. Government's Obligations

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A) and (B). The government agrees to recommend a sentence within the applicable guideline range for the criminal history and total offense level calculated by the Court at sentencing. The government further agrees to move to dismiss the Indictment at the time of sentencing. Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement and potentially file a superseding indictment. The parties understand that this agreement is not binding on the Court.

Provided the defendant does not engage in prohibited conduct or otherwise implicate USSG §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a).

If the defendant engages in conduct which implicates USSG § § 3C1.1 cmt. n.4 between the guilty plea and sentencing in this case, in addition to any other consequences, the government will be released from its obligations under the plea agreement, and the defendant will not thereby have any right to withdraw from the plea agreement.

### C. Defendant's Waiver of Appeal

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

(1)     the sentence exceeds the maximum sentence provided in the statute of conviction, 18 U.S.C. § 875(c);

(2)     the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at a total offense level of 12; or

(3)     the government appeals the sentence imposed.

If the first criterion applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence. But if one of the latter two criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

(1)     the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2)     the defendant was deprived of the effective assistance of counsel; or

(3)     the defendant was prejudiced by prosecutorial misconduct.

The United States agrees not to argue a procedural bar to a prosecutorial misconduct claim raised in a § 2255 petition based on the failure of the defendant to raise that issue on direct appeal.

The defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings. In that event, this waiver does not apply and the defendant may

appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a).  This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

## II.    ELEMENTS OF THE OFFENSE

The parties agree that the elements of 18 U.S.C. § 875(c) are as follows:

*First*: the defendant knowingly transmitted a communication containing a threat to injure the person of another;

*Second*: the defendant transmitted the communication with the intent to make a threat, or with knowledge that the communication would be viewed as a threat;

*Third*: the communication was transmitted in interstate or foreign commerce.

A "threat" is a serious statement expressing intent to instill fear, which, under the circumstances, would cause apprehension in a reasonable person, as distinguished from mere political argument, idle talk, exaggeration, or something said in a joking manner. It is not necessary that the defendant intended to carry out the threat, nor is it necessary that the defendant had the ability to carry out the threat.

### III.    STATUTORY MAXIMUM SENTENCE

The maximum sentence for a violation of Count 1 of the Information is: not more than 5 years' imprisonment; maximum term of supervised release 3 years; maximum fine $250,000; $100 mandatory victim's fund assessment fee; restitution is not applicable in this case.

### IV.    COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury.

### V.    STIPULATION OF FACTS

The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties stipulate that the following facts are true and correct:

As described in more detail below, on March 20, 2025, Carl Howard Payne sent threatening communications to several news agencies via email and a messaging app Signal. In those communications, Mr. Payne declared "war on the 47th Presidential Cabinet of the United States of America," announced "wartime Operations… culling opposition ranks, and by other

hostile means," and threatened that: "On Thursday, 17 April 2025, We will begin killing war financiers, specifically owners, drivers, and occupants of Tesla Swasticars. Terminations will take place at their homes, on the road, while shopping, or at Nazi charging stations." On March 20, 2025, the defendant knowingly transmitted these threats in four electronic communications in interstate commerce via email and through the messaging app Signal. The defendant admits that he intended each of these communications as threats to owners, drivers and occupants of Tesla vehicles and that he knew each communication would be viewed as a threat to owners, drivers and occupants of Tesla vehicles.

*Threatening emails sent to News Media.*

On March 20, 2025, while physically present in the District of Colorado, the defendant sent an email from betweensaltandstart@proton.me to Cable News Network ("CNN") at the email address cnn@cnn.com. The betweensaltandstart@proton.me account was created on March 20, 2025, from IP address 4.223.165.202. That IP address resolved to an account owned by Carl Payne. The defendant admits he was the person who sent the email from betweensaltandstart@proton.me to cnn@cnn.com on March 20, 2025. The email was transmitted in interstate and foreign commerce.

The subject line of the March 20, 2025 email to CNN was: "Declaration of War." The body of the email was as follows:

DECLARATION OF WAR
against
The 47th Presidential Cabinet of
the United States of America

We the People, empowered by our Constitution and inspired by our Declaration of Independence, do hereby exercise our right to alter and abolish the current government.

*Be it Recognized,* an irreparable state of enmity exists between Common Americans and The 47th Presidential Cabinet of the United States of America, which requires a State of War; and that such a war is provided for and guaranteed by the Constitution and its Amendments for this specific purpose.

*Be it Recognized,* that the actions of The 47th Presidential Cabinet of the United States of America are fascist in nature and contrary to the interests of Common Americans; that, in particular, President Donald Trump is operating above the law:

He has been impeached twice, making him "forever disqualified" from holding federal office under Article 1, Section 3, Clause 7 of the Constitution of the United States, regardless of self-pardon. The Clause is for this exact purpose and he should never have been on the ballot.

He has violated his Presidential Oath.

He has operated witch hunts across America, violating privacy and common decency in a desperate search for any proof that the figments of his imagination are real.

He actively calls for the arrest, impeachment, or dismissal of officials critical of him.

He has terminated tens of thousands of Federal jobs, without cause.

He has provided lucrative government contracts to likewealthed individuals in a flagrant conflict of interest, to the Despotism of Common Americans.

He has granted unelected persons widespread Government access and authority, whom function without due process of law.

He has destroyed the privacy of Americans' Social Security data.

He has activated and empowered racism, bigotry, and hatred.

He has fostered class warfare among Americans, perpetuating the bigotry that marginalized groups are an enemy to "Great" America, and deserving of whitewashing.

He has violated the First Amendment of the Constitution of the United States by using religion as an excuse for Cabinet actions, policy, and discrimination.

He is an immediate threat to the personal financial investments of Common America in its own retirement accounts, endangering the lives of millions of at-risk Americans.

He has injured, and continues to injure, American Veterans.

He famously and liberally generates and fosters hyperbole, misrepresents it as "truth," regards truth as "fake news," and uses his power to alter recorded history to that end.

He is a coward and no inspiration to National Service.

He is a liar and cannot be trusted with National affairs.

He is mentally unstable and his actions are destroying the lives of most Americans.

He possesses and wields more hatred in one day than even whole societies should *ever* have, and he encourages others to perpetuate it.

His foolish ignorance has given him the delusion of power over all nations, specifically our dear friends Canada and Denmark, with the constant shimmer of rattling sabers to iron his despotism home.

He is not only an imminent threat to world peace, he made preparatory acts of war by attempting to move jet fuel to Greenland in advance of a Greenland-staged blockade against our neighbors as a grotesque reenactment of the Cuban Missile Blockade.

He is a hypocrite and cannot be trusted to keep his word with World Leaders, as he has demonstrated many times that neither word, handshake, or his own signature on a contract will be respected.

His persistent unlawful actions against persons who are not white males is a form of genocide.

He repeatedly, violently, harms Common Americans with egregious impunity.

He is incapable of diplomatically ending even *this* war.

His felony convictions and disregard for law conflict with America's sense of justice.

His wealth gives him the unique capability to avoid any punishment for his multiple felonies.

He has the lunacy, tyranny, and ordnance necessary to end the United States of America in a scorched earth campaign, and legal action won't stop him.

It is therefore necessary to affect wartime Operations in defense of Americans' right to life, liberty, and the pursuit of happiness, by destroying matériel, culling opposition ranks, and by other hostile means, until such time as the entire 47th Presidential Cabinet of the United States of America is removed from power and its Executive Orders voided.

There is no room for racism in America. We will not tolerate the minimization of life that is not white and male. We will not permit a repeat of the Islamic Revolution in our own land, regardless what religion the Cabinet wraps it in.

We will not be oppressed, we will not be erased, we will fight back and we will be a greater America than anyone has ever claimed without uttering a single word. This is the United States of America, and we will not go back to the time of hatred and bigotry, when rich white men held lives in the balance of their folly.

To free our Nation we will not be burdened by the luxury of mercy, nor suffer the lethargy of jurisprudence, nor be discouraged by our own vulgar poverty.

Death is no threat to Those under the boot, but We deeply regret its necessity in this matter.

Signed in Freedom; in Love and good charter with all oppressed communities; with respect to those pawned to stop us; in the face of incomparable hatred, do we affirm these facts on Monday, the Seventeenth day of March, in the year Two Thousand Twenty-Five.

[signatures unavailable this copy]

------------------------------------------------------------------------------------------------------------------------------

Operation: Swasticar

Objective:
The death of Elon Musk

Abstract:
On Thursday, 17 April 2025, We will begin killing war financiers, specifically owners, drivers, and occupants of Tesla Swasticars. Terminations will take place at their homes, on the road, while shopping, or at Nazi charging stations. We will continue this Operation until Elon Musk's death.

Duration:
Perpetual until complete. He is no longer welcome to be alive.

Terms:
There are no terms. This is a counterattack with a S.M.A.R.T. objective.

Specific Evidence of Our Activity:

- All bullets are .30 or .40 or .50 caliber, always FMJ.
- All Semtex is from the same source; caps and Detcord are not.
- All guitar strings are G's (0.0170") and from the same manufacturer.
- Our EXIF data always matches the termination site.
- We 3D-print those plastic tools for that exact purpose, and filament color is meaningless.

Evidence that it was *not* Us:

- Escalating confrontations or "road rage."
- Bullets not listed above.
- Use of IEDs.

- Survivors.
- Rope.

Advice:

- Municipalities with high Swasticar density should prepare an adequate HAZMAT response plan. Ideally, prepare for simultaneous electric vehicle fires, containment of toxic smoke, and executing a downwind-evacuation.

On March 20, 2025, while physically present in the District of Colorado, the defendant sent an email from betweensaltandstart@proton.me to The Washington Post at the email address lockbox@washpost.com, which was also transmitted to KTNV-TV Channel 13 News, Las Vegas, NV; CBS KKTV News, Colorado Springs, CO; and KUSA-TV Denver 9 News, Denver, CO. The defendant admits he was the person who sent the email from betweensaltandstart@proton.me to lockbox@washpost.com on March 20, 2025. The email was transmitted in interstate and foreign commerce. The subject line of the email was: "Declaration of War." The beginning of the email was as follows:

17 March 2025

ATTN: News Desk

We have declared war on the 47th Presidential Cabinet of the United States of America and are sharing details of Our first Operation.

Specifically, We are responsible for the newsworthy killings that commence Thursday, 17 April 2025. The enclosed information is For Immediate Release and will help validate evidence shown in the coming social media campaign.

The media are not asking direct, pointed, specific questions of the Cabinet (e.g., 'Why are you discriminating against minorities'), and the media accept the morsels they're given for a chance to be close to the action. We will get you closer.

We are Luigi.  We Are One.

After that opening paragraph, the defendant's email included the "Declaration of War" and "Operation Swasticar" language shown above, *see supra* pages 7-11, that was sent to CNN.

*Threatening Signal messages sent to News Media*

On March 20, 2025, while physically present in the District of Colorado, the defendant also sent ProPublica and Reuters the same message that he had sent The Washington Post.  The defendant transmitted these communications to ProPublica and to Reuters in interstate commerce using Signal, an electronic messaging application.  The username the defendant used to send those messages was "c".  Law enforcement agents obtained a warrant to search the defendant's person.  That warrant also authorized the search of electronic devices.  During the search of the defendant's smartphone, law enforcement agents found that defendant had downloaded the Signal application to his smartphone and set the username to "c".  Law enforcement officers found Signal messages on defendant's phone between defendant and D.S., in which defendant confirmed that he had set his Signal user as "c".  Law enforcement agents also found Signal forensic data on defendant's phone showing that defendant had interacted with ProPublica and Thomson Reuters through Signal.  The defendant admits that he sent the threatening communications to ProPublica and Reuters via Signal.

*Threatening letters mailed to Insurance Companies*

In early April 2025, three insurance companies received letters postmarked from within the District of Colorado.  Portions of the letters were substantially similar to the Declaration of

War and Operation Swasticar portions of the threatening messages sent to news media described above.

*April 15, 2025 search of the defendant's residence*

On April 14, 2025, law enforcement agents obtained a warrant to search the defendant's residence. During the warrant authorized search of the defendant's residence on April 15, 2025, law enforcement agents found a shredded partial copy of the threatening communication in a shred bin in defendant's home office. In a trash bin in defendant's residence, law enforcement agents also found a test print envelope addressed to State Farm Insurance with the White House listed as the return address and a partial book of Liberty Bell 'Forever' stamps which appeared to match the Liberty Bell 'Forever' stamps used to send three letters to different insurance companies containing a substantially similar threat as those sent by email and Signal. During the search, law enforcement officers also located several firearms as well as ammunition. Three of the firearms were .40 caliber, one of the same calibers mentioned in the threatening communications. Some of the ammunition was .40 caliber full metal jacket, consistent with one of the calibers of bullets "always FMJ" mentioned in the threatening communications.

Law enforcement agents also obtained a warrant to search the defendant's Google account for, among other things, the defendant's internet search and browsing history. The search warrant returns from Google showed that between March 15, 2025 and March 20, 2025, the defendant searched for, among other things: "tesla," "Tesla Service Center," and "tesla factory locations." The defendant also searched for declarations of war; "guitar wire gauges," which feature in the threatening communications ("All guitar strings are G's (0.0170")"); and several other terms that appear in the threatening communications, including "s.m.a.r.t." ("This is

a counterattack with a S.M.A.R.T. objective"), "det cord," and "signature unavailable." The defendant's search and browsing history between March 18, 2025 and March 19, 2025 also includes searches or visits to websites for cnn.com, Reuters, KKTV Colorado Springs, KTNV Las Vegas, and ProPublica, as well as searches for many other news agencies.

## VI.    ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand that the government has an independent obligation to assist the Court in making an accurate determination of the correct guideline range. To that end, the government may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

        a)     Under Section 2A6.1(a)(1), the base offense level is 12.

        b)     The following specific offense characteristic applies: A two-level increase applies because the offense involves more than two threats. *See* U.S.S.G. § 2A6.1(b)(2). The parties agree that Section 3A1.2 does not apply.

        c)     The adjusted offense level is 14.

        d)     The parties agree that a two-level decrease applies based on the defendant's acceptance of responsibility. The resulting total offense level

is 12.

e)  The parties understand that the defendant's criminal history computation is tentative and based on the defendant's prior convictions.  The parties believe the defendant is in criminal history category I.

f)  The career offender/criminal livelihood/armed career criminal adjustments do not apply.

g)  The advisory guideline range resulting from these calculations is 10 months to 16 months.  However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level(s) estimated above could conceivably result in a range from 10 months (bottom of Category I) to 37 months (top of Category VI).  The guideline range would not exceed, in any case, the cumulative statutory maximums applicable to the counts of conviction.

h)  Pursuant to guideline § 5E1.2, assuming the estimated offense level above is correct, the fine range for this offense would be $5,500 to $55,000, plus applicable interest and penalties.  However, based on the fact that the defendant has court appointed counsel, it appears that he is unable to pay and is not likely to become able to pay any fine.  Therefore, the United States is not requesting a fine.

i)  Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term shall be at least one year but not more than three years.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.    ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement.  There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances,

express or implied. In entering this agreement, neither the government nor the defendant has

relied, or is relying, on any other terms, promises, conditions or assurances.

Date: 28FEB26

Carl Howard Payne
Defendant

Date: 2/28/26

Luke McConnell
Attorney for Defendant

Date: 4/1/26

Jasand Mock
Assistant U.S. Attorney

Date: 4/1/26

Dustin André-Vandenberg
Assistant U.S. Attorney